STATE OF MISSOURI ex rel. J. E. TAYLOR, Appellant, v. PAUL ANDERSON and JAMES CAMPBELL, Respondents, No. 42310—242 S. W. (2d) ·66.

Division One, September 10, 1951.

514

*J. E. Taylor*, Attorney General, and *Aubrey R. Hammett, Jr.*, Assistant Attorney General, for appellant.

*William T. Powers* and *Henri Sursa* for respondents.

DALTON, J.—Action in equity to enjoin defendants from using the state boat dock in Big Spring State Park in Carter County and from trespassing on state property in said park by carrying on and operating the business of transporting visitors on sight-seeing tours for hire on and across the park property, out into Current River and return to the park. After a hearing on the merits, the trial court found the issues for defendants, dissolved a temporary

injunction theretofore issued, refused a permanent injunction and entered judgment for defendants. Plaintiff has appealed.

Plaintiff alleged that Big Spring State Park, therein described, was owned by the state and controlled by the State Park Board, which was vested with authority to regulate, maintain and preserve the park property; that defendants were continuously operating and carrying on a business in Big Spring State Park, to-wit, transporting visitors in said park on sight-seeing tours by boat from a dock belonging to the state and located in the park; that visitors were taken across state property and into Current River and returned across state property; that defendants had been ordered to discontinue the operation of their business in and upon the state property; and that they had refused to do so and continued to operate said business. It was further alleged that the State Park Board had a written contract with C. D. McKinney to operate a boating concession in Big Spring State Park; that the operation of defendants' business was in direct conflict with the interests of the state and C. D. McKinney; that the conduct of defendants in continuing to operate said business constituted a public nuisance and was causing great injury, irreparable damage and inconvenience; and that plaintiff had no adequate remedy at law.

Defendants admitted that, for the purposes of this suit, the plaintiff owned the real estate described in the petition; and that the State Park Board was created by legislative act and was "vested with authority under the statutes of Missouri to make and promulgate all rules and regulations as it may deem necessary for the proper maintenance, improvement, acquisition and preservation of all state parks," but denied that such authority was material in this case. They admitted that they "were engaged in operating boats at Big Spring State Park on sight-seeing tours and transporting visitors to the State Park on said tours on and over the Big Spring branch or out-let and into and over Current River and that in such operations they used the boat dock owned by the State of Missouri and under the jurisdiction of the State Park Board."

Defendants alleged "that whatever operations in the way of boating, as aforesaid, they performed and transacted were and are with the full knowledge and consent of the Park Board of the State of Missouri, and all employees thereof; and that the present season of boating for the year 1950 was so begun and continued by them with ▮▮▮▮ such full consent of the Park Board; and these defendants deny that they were ever at any time legally and lawfully notified or ordered to cease and discontinue such operations, or that they are now refusing to cease or discontinue such operations by reason of any lawful authority legally discontinuing the arrangement under which they operated; and further deny that any act of the defendants performed in and on the State Park was and is unlawful and in violation of law:

but aver that all their operations were at all times lawful and in compliance with all rules and regulations of the Park Board."

Defendants further alleged "that * * * at all times these defendants paid to the representatives of the State of Missouri and the State Park Board certain agreed commissions on the gross amount these defendants collected from the passengers that took all the boat rides * * * that they did not at any time expect that they would be hindered in said operation in the middle of the season this year but had every reason to believe that they would continue under the agreement under which they had previously for all the years operated * * * and these defendants state that they in good faith performed their part of the agreement under which they operated, and are ready and willing to continue to operate under said agreement." Defendants further alleged that on June 7, 1940, they were advised in writing by the Director of the State Park Board that they might operate their boats on Big Spring State Park in park waters until such time as their license may be revoked because of violation of rules and regulations and that their said permits and license and authority to operate was never revoked.

Plaintiff's evidence tended to show that the State Park Board had on April 17, 1946 made and promulgated detailed rules and regulations for the management and control of the state parks. A copy of these regulations was filed with the Secretary of State on April 20, 1946. These regulations provide that the solicitation of any business or service is prohibited and that no person is permitted to offer or advertise merchandise or other goods for sale or hire; or to maintain any concession except by written permission of the State Park Board. On March 1, 1949 the State Park Board entered into a written concession contract with one C. D. McKinney by which contract the state granted him certain exclusive concessions, including a permit to operate the boating concession at Big Spring State Park for a period beginning March 1, 1949, and ending December 31, 1952, in consideration of his payment of a sum equal to five per cent of the gross receipts from operating the concessions. He was also employed as superintendent of the park for the duration of the contract at a salary of $100 per month.

The contract further provided: "Complete accounts of all receipts shall be kept by the party of the second part on books furnished by the party of the first part for that purpose, said books to be open for inspection to the party of the first part at all times, and shall be audited once each month by a representative of the State Park Board. On the first day of each calendar month an itemized statement covering all sales, rentals and all other receipts from all said concessions, together with a remittance of the sum equal to five per cent (5%) of the gross receipts of said concessions for the preceding month, shall be delivered to the party of the first part by the party of the second

part. \* \* \* The party of the first part reserves the right to determine the prices to be charged for cabins, rooms, meals, merchandise, hire and facilities and services. \* \* \* The party of the second part shall not assign, transfer, convey, sublet or otherwise dispose of this permit or of any right under this instrument without the previous consent in writing of the party of the first part." First party, during the life of the contract agreed not to "issue to any other person a permit to operate any of the concessions in said park."

Prior to the time the State Park Board made its contract with McKinney, the defendants had been operating boats from the state boat dock in Big Spring State Park during the period from April to November of each year and McKinney permitted them to continue their operations ▓ after the contract was signed. Defendants fixed their own charges for their float trips out of the park, down Current River and for the return to the park. McKinney was paid 10 per cent of what they reported as their gross receipts and he remitted one-half of this amount or 5 per cent to the state under his contract. McKinney had been made superintendent in 1944 and the defendants were permitted to operate on this basis in 1944, 1945 and 1946. No written contractual arrangements were made with defendants either by McKinney or the State Park Board. The State Park Board at no time gave McKinney any written authority to subcontract or sublet the boating concession. In 1950 the State Park Board sent forms to McKinney and asked for daily reports on all float trips made from the park, the number of passengers carried, whether on short or long trip and the amount collected on each trip. Under its contract with McKinney the State Park Board looked to him for compensation from the boating concession and demanded the reports. McKinney asked the defendants to keep daily records and report "the amount of revenue and passengers and price schedule" and they informed him that they would not do it. They refused to fill out the forms or to comply with prices suggested and "said they wasn't going to keep books for the Park Board." The prices suggested by the board were forty cents single fare for adults and twenty-five cents for children under twelve years of age. Defendants charged forty cents regardless of age and said they would continue to do so. McKinney first talked to defendants on May 27, 1950 and later on June 6, 1950. The latter conversation was had in the presence of another employee of the State Park Board, who corroborated McKinney's testimony. When defendants told McKinney that they would not comply with the requested prices, nor make the reports he "told them they were dismissed." He said: "You are through and you can get your boats out of here." They advised him that "they would go ahead and operate any way." They did continue to operate and tendered McKinney certain amounts which they represented to be 10 per cent of their gross receipts, but he refused to accept the tenders.

After McKinney's conversation with defendants on June 6, 1950, defendants went to Jefferson City for a conference with Abner Gwinn, Chief of the State Park System. On June 7, 1951, defendants discussed with Mr. Gwinn the difficulties they were having with Mr. McKinney. They told Gwinn that McKinney had ordered them to remove their boats from Big Spring Park. Gwinn personally told defendants to cease operations in the park and that he "hoped they would not continue to operate." They admitted to him that they refused to keep the records requested by the board and McKinney; and that they would not charge for services as suggested. They said they would continue to charge full price for any one who took a seat in their boats; and that they were going back and continue operating their boats in the park. Defendants did continue to operate their boats from the state dock in the park as they had been doing and did not make the reports or change their charges.

On June 13, 1950, the State Park Board requested the Attorney General to take the legal steps necessary to stop the operation of boats by the defendants at Big Spring State Park. On June 20, 1950, the present suit was instituted.

Defendants' evidence tended to show that the defendants had long been engaged in the operation of motor boats carrying passengers for hire out of Big Spring State Park; that McKinney told each of the defendants he had a written contract with the State Park Board for concessions in Big Spring State Park; that they did not know its terms except as he told them; that in April or May 1945 McKinney first told them he wanted them to run their boats in the Park; that after April 1945 they paid McKinney 10 per cent of all gross receipts and got receipts from McKinney; that they continued to operate from 1945 to 1950; that nothing was said about not operating from the season of 1950, that is, before they started operating in 1950 or prior to June 6, 1950; that the first knowledge they had that they were supposed to quit operating was on June 6; that there wasn't any trouble about the amount of commissions until June 1950, when McKinney demanded 15 per cent commission; that McKinney brought forms for reports and said he wanted them filled out for adults, children, short and long trips, the number of passengers for each trip and price paid; that McKinney discussed prices to be charged for children (25 cents); that they did not turn in any of the forms which McKinney delivered to them; that defendant Campbell advised McKinney that he didn't feel like he was getting paid for keeping books for McKinney or the state; that a Mr. Holloway, a representative of the State Park Board, asked defendants why they refused to fill out the forms and they asked why the state wanted the reports; that after defendant Anderson'had asked three times why the state wanted the forms filled out, McKinney said "as far as I am concerned you are through"; that Holloway said, "If McKinney tells

you to get out then we are asking you to get out"; that no written notice was served, until the notice of the temporary injunction; that defendants went to Jefferson City to see Mr. Gwinn on June 7, 1950; that they discussed prices for service with Gwinn; that Gwinn told them the State Park Board was "behind Mr. McKinney and what he did the Park Board was going to back him up"; and that Gwinn told them the Attorney General would try to stop them from operating and asked them what they intended to do. They told Mr. Gwinn that they intended to go back and continue operating until something was done. After about 5 days they went back and started operating their boats. Defendants admitted that they did not make the reports requested or conform to the prices required; and that McKinney refused the tender of commissions after June 5th or 6th on the ground that "you have been ordered to refrain from operations on the State Park grounds, and waters and your continued operations there constitute trespass."

Defendants offer letters from I. T. Bode, Director, dated June 7, 1940, some ten years prior to the present difficulty, advising each of the defendants that their application for "a commercial docking permit at Big Spring State Park had been approved" and stating that they were authorized to use specified boats in park waters "for the calendar year 1940, or until such time as this license may be revoked because of violation of rules and regulations of the State Park Board * * *." The letters were "offered to show why they (defendants) were there" and were received in evidence over plaintiff's objection that no authority was shown therefor.

Defendants further offered evidence tending to show they had charged the rates fixed by the state, operated their boats in a careful manner, did not knowingly violate any rules and regulations and in good faith tried to perform their duty.

In the decree finding the issues for defendants, the court found that the plaintiff "has an adequate remedy at law to correct any acts" of defendants as set forth in his petition.

In an equity case we review the record de novo, determine the credibility, weight and value of the testimony and evidence in the case, giving due deference to the trial chancellor's findings. Respondents have not favored us with a brief and we are not advised as to their position except as disclosed by the record. Nor are we advised as to the trial court's theory in finding for respondents, except as indicated by the decree, supra.

■■ The action was instituted by the Attorney General in the name of the state and at the special instance and request of the State Park Board to protect the rights and interests of the state. Section 27.060 RSMo 1949. The judgment entered is a final and appealable one. Oberkoetter v. Luebbering, 4 Mo. App. 481, 483; Sec. 512.020 RSMo

1949. The state is a party and this court has jurisdiction of the appeal. Sec. 3 Art. V. Constitution of Missouri 1945.

The State Park Board is the state agency created and authorized to manage and control the state parks. Chap. 253 RSMo 1949. Sec. 253.020 RSMo 1949 expressly provides that the "park board shall have the power to make and promulgate all rules and regulations as it may deem necessary for the proper maintenance, improvement, acquisition and preservation of all state parks."

Pursuant to the power and authority expressly granted by statute, the board did on April 17, 1946 adopt rules and regulations for the management and control of the state parks. On April 20, 1946, a copy of these rules and regulations were filed with the Secretary of State as required by Sec. 536.020 RSMo 1949. These rules and regulations expressly prohibited the solicitation of business or service, the offering of merchandise or goods for hire or the maintenance of any concession in any state park except by the written permission of the State Park Board. The record in this cause clearly shows that respondents have never had any written authority from the State Park Board to operate a boating concession in Big Spring State Park and that C. D. McKinney to whom the State Park Board granted the exclusive permit to operate the boating concession in the park on March 1, 1949, has not had the previous consent in writing of the State Park Board to "assign, transfer, convey, sublet or otherwise dispose of" the boating permit to respondents or sublet any right obtained under his exclusive concessionaire written contract with the park board. Under the pleadings filed and evidence presented respondents did not rely upon any written contractual authority from the State Park Board or from anyone else to operate the boating concession in Big Spring State Park and to carry on their business of transporting passengers for hire by boat from appellant's dock over and across the park property out on to Current River and return to the state dock.

As we read this record, respondents first rely upon letters purporting to be written by the director of the State Park Board to the respective respondents on June 7, 1940, some ten years before the present difficulties arose, and purporting to be commercial docking permits for the calendar year 1940, "or until such time as this license may be revoked because of violation of rules and regulations." No authority of the State Park Board for the writing of the letter, or for the issuance of a license or permit to either respondent was shown. The letters were offered and received in evidence over appellant's objections and for the alleged purpose "to show why they (respondents) were there." The letters could constitute no more than a bare license, or permit, subject to withdrawal or canceled at the pleasure of the State Park Board, if granted with the board's knowledge, authorization or consent. Neither the state nor its agency the State Park Board could surrender or contract away its police power to

protect the public welfare and the well being of the state. Art. XI, Sec. 4 Const. of Missouri 1945; City of Cape Girardeau v. St. Louis-San Francisco R. Co., 305 Mo. 590, 267 S. W. 601, 603.

■ Respondents by their pleadings and evidence show no more than a bare license, oral consent, or agreement of the Park Superintendent and exclusive concessionaire for the operation of their business in the state park and the tolerance thereof by the State Park Board prior to a time immediately preceding the institution of the present action. Giving due deference to the trial court's finding for respondents and the fact of the court's better position to judge the credibility, weight and value of the oral testimony presented, nevertheless upon the facts admitted by the pleadings and the testimony of respondents in their own behalf, any consent, license, permit or tolerance of respondents' activities in the Big Spring State Park had been terminated prior to the institution of the present suit. Each of the respondents admitted they were advised of McKinney's written contract with the State Park Board for the exclusive operation of concessions in the park. They admitted they had consulted McKinney and obtained his oral permission to continue the operation of their business. They attempted to enter into no more than an oral contractual relationship indefinite as to time. They recognized McKinney's authority and tendered to him and he accepted 10 per cent of what they reported as the gross receipts of their business operations in the park. They knew that 5 per cent went to McKinney ■ and 5 per cent to the state. This relationship with McKinney conflicted with the terms of his contract and respondents' operations, being without the written consent of the board, were contrary to the rules and regulations of the State Park Board.

We are not here concerned with the particular reasons or circumstances resulting in the termination of their relationship with McKinney and the State Park Board, or the giving of the oral notice by McKinney and the State Park Board to respondents to stop their operations in the park. Both respondents admit they had knowledge of the fact that McKinney and the State Park Board intended and undertook to terminate any license, permit, oral agreement, consent or tolerance of respondents' operations in the park.

McKinney's oral agreement, license or permission for respondents to continue their operations and to pay over to him 10 per cent of their gross receipts and the State Park Board's tolerance of such oral arrangements were subject to withdrawal on notice. Pitzman v. Boyce, 111 Mo. 387, 19 S. W. 1104; Strong v. Sperling, 200 Mo. App. 66, 205 S. W. 266. The arrangements shown, even if considered as an oral contract, were for an indefinite term and could be terminated at will. Paisley v. Lucas, 346 Mo. 827, 143 S. W. (2d) 262, 271; Clarkson v. Standard Brass Mfg. Co., 237 Mo. App. 1018, 170 S. W. (2d) 407, 415; Mass. Bonding & Ins. Co. v. Simonds-Shields-Lonsdale Grain

Co., 226 Mo. App. 1071, 49 S. W. (2d) 645, 648; Latshaw v. Stoddard (Mo. App.), 194 S. W. 727, 728(2). The oral license, permit or agreement for respondents' operations under the facts shown could give them no vested interest or contractual right to continue such operations after notice from both McKinney and the State Park Board to stop their operations. Wood v. Gregory (Mo. Sup.), 155 S. W. (2d) 168, 171. Both of the respondents admitted their intent and purpose to continue operations regardless of such notice and orders to discontinue, and they admitted the continuance of their operations in fact until stopped by the temporary injunction issued in this cause.

 On the admitted and conceded facts shown by this record, we think the appellant was entitled to the relief asked. At the time the action was instituted the respondents had no consent or contractual rights from either McKinney or the State Park Board to continue to use the state's dock or to use the state's property in carrying on their business for profit. Appellant by and through the agency of the State Park Board had the management and control of its own property. The regulations prohibited the operation of respondents' business without written authority from the State Park Board. Respondents were making an unlawful and unauthorized use of state property, without justification or excuse, rejecting the authority of the state and the State Park Board to control and protect the state's property. A written contract had been entered into with McKinney for the exclusive boating concession in the park and the state and its agency had a specific interest under the contract in protecting McKinney in the rights granted to him. The acts complained of were intentional, continuous and damaging, but the damages were indefinite, uncertain and so difficult of ascertainment that adequate compensation could not be obtained in actions at law. Not only would an action for damages be a wholly inadequate remedy in the premises, but relief at law would involve a multiplicity of suits. When there is no adequate remedy at law either for damages or without a multiplicity of suits, an injunction will lie to prevent the doing of a legal wrong. Bryant v. West (Mo. Sup.), 219 S. W. 355 (where after the termination of a parol license the landowner obtained an injunction to restrain the continued use of his property as a landing in the operation of a ferry); Turner v. Stewart, 78 Mo. 481, 482; Carpenter v. St. Joseph, 263 Mo. 705, 174 S. W. 53; Thompson v. City of Malden, (Mo. App.) 118 S. W. (2d) 1059, 1064; Nelson v. Kelley, 145 Mo. App. 110, 128 S. W. 832; Sec. 526.030 RSMo 1949; 43 C. J. S. 676, Injunction, Sec. 128. And see City of St. Louis v. Friedman, 358 Mo. 681, 216 S. W. (2d) 475, 479; 64 C. J. S. 302, Sec. 1818; 64 C. J. S. 310, Sec. 1823.

The judgment is reversed and the cause remanded with directions to grant appellant the relief sought. All concur.